**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Tyler Koley,

               Plaintiff,

v.

Unknown Williams, et al.,

               Defendants.

No.   CV 19-08038-PCT-DWL (JZB)

**ORDER**

## INTRODUCTION

On January 11, 2018, officials at the Arizona State Prison Complex in Winslow, Arizona conducted a routine search for contraband in inmates' cells.  During the search process, Plaintiff Tyler Koley ("Plaintiff") and his fellow inmates were removed from their cells and told to put on their shoes.  Plaintiff refused to put on his shoes, prompting a pair of prison guards to place restraints on his hands and begin walking him away from the area.  Plaintiff, in turn, attempted to "protest" by sitting down on the ground and refusing to walk.

Defendants Matthew Theobald, Joseph Valdez, and Jackie Williams ("Defendants") were all located at least 20 yards away from Plaintiff as this struggle unfolded.  Williams, a canine officer, moved toward the disturbance and then released his dog.  The dog bit Plaintiff once in the back, causing Plaintiff to suffer minor injuries that healed without complication.

In this civil rights action under 42 U.S.C. § 1983, Plaintiff alleges that Defendants violated his Eighth Amendment rights.  Specifically, Plaintiff alleges that Williams used

excessive force by unnecessarily deploying the dog, that Theobald and Valdez failed to intervene, and that all three Defendants deprived him of adequate medical care.  Now pending before the Court is Defendants' motion for summary judgment, which Plaintiff opposes.  (Docs. 44, 48, 50.)  In a nutshell, Plaintiff argues that because his account of the incident on January 11, 2018 differs from Defendants' account—he contends he wasn't fighting with the guards and didn't pose a threat to anybody, while Defendants contend he was head-butting and kicking the guards—the presence of these factual disputes precludes the entry of summary judgment.

As explained below, Plaintiff is mistaken.  Although many details of the incident are disputed, Plaintiff concedes (or doesn't dispute) several key facts, including that he was "struggling" with the guards right before Williams released the dog, that Williams was unaware Plaintiffs' hands were restrained at the time the dog was released, that the unusual conditions on the prison yard on January 11, 2018 posed a particularly acute security risk, and that Williams immediately pulled away the dog upon realizing that Plaintiffs' hands were restrained.  Because there was no clearly established law in January 2018 prohibiting the deployment of a dog in the prison context under these (or analogous) circumstances, Williams is entitled to qualified immunity on Plaintiff's excessive force claim.  Meanwhile, Plaintiffs' remaining claims fail on the merits—Theobald and Valdez were too far away from the fracas to have any reasonable opportunity to intervene and Plaintiff's medical care claim is undeveloped.

## BACKGROUND

I.   <u>Underlying Facts</u>

The facts set forth below are derived from the parties' summary judgment submissions (Docs. 45, 49), with all conflicts resolved in the favor of Plaintiff, the non-movant.

On January 11, 2018, Plaintiff was an inmate at the Arizona State Prison Complex in Winslow, Arizona.  (Docs. 45, 49 ¶ 1.)  Valdez was a Correctional Sergeant assigned to

the Coronado Unit, where Plaintiff was housed.  (*Id.* ¶ 2.)  Williams and Theobald were Correctional Sergeants in the canine unit assigned to Coronado Unit.  (*Id.* ¶¶ 3-4.)

That day, the Tactical Support Unit ("TSU") conducted a quarterly search of the prisoner housing areas for potential contraband.  (*Id.* ¶ 5.)  As part of the search, all prisoners were strip-searched, then allowed to put their clothes back on, and then escorted out of their housing areas.  (*Id.* ¶ 6.)  The prisoners were also directed to wear their shower shoes, which are similar to sandals.  (*Id.* ¶ 7.)  The prisoners were escorted outside to gather in specified areas of the yard, including the basketball court, until the search was completed.  (*Id.* ¶ 8.)  The inmates were not restrained during this process.  (*Id.* ¶ 9.)

It is undisputed that these conditions posed a heightened security risk.  In their separate statement of facts, Defendants assert that (1) in general, inmate disturbances pose a security risk because they can agitate other inmates and incite further violence, and (2) Defendants were particularly concerned about these risks on January 11, 2018 "due to the number of inmates on the yard and the fact that none of the other inmates were restrained." (Docs. 45 ¶¶ 23-24.)  In his separate statement of facts, Plaintiff admits in relevant part that both of these facts are true.  (Doc. 49 ¶¶ 23-24.)

During the search, Valdez was supervising the prisoners on the basketball court, which was approximately 40 to 50 yards away from the entrance to the housing unit.  (Docs. 45, 49 ¶ 18.)  Williams's role during the search was to conduct security patrols with his dog and to escort prisoners to and from the gym.  (*Id.* ¶ 19.)  Initially, he was located about 20 yards away from Plaintiff.  (*Id.* ¶ 26.)  Theobald's role was to escort other prisoners to the gym, which was 150-200 yards away from Plaintiff.  (*Id.* ¶ 20.)

When Plaintiff was told to put on his shower shoes by the TSU officers, he asked whether he needed to put them on, explaining that when he was at another unit, the prisoners did not have to wear their shower shoes when the weather was cold.  (Docs. 45, 49 ¶ 10; Doc. 45-1 at 47.)  A TSU officer told Plaintiff that he understood but the supervisor wanted all prisoners to wear their shower shoes.  (*Id.*)  Plaintiff still refused to wear his shower shoes.  (*Id.*)  In response, a TSU officer directed Plaintiff to put on his jacket and

1    prepare to be "cuff[ed] up."  (Doc. 45-1 at 48.)  Plaintiff was then restrained with "flex
2    cuffs" or zip ties.  (*Id.*)  Two TSU officers then escorted Plaintiff outside his housing area.
3    (*Id.*)

4         The parties largely dispute what happened next.  According to Plaintiff, one of the
5    TSU officers said, "Let's place him down in the dirt."  (*Id.*)  In response, Plaintiff told the
6    officers he would not "be demeaned" and that they could "take him to the hole," that is, to
7    the isolation unit, and give him a disciplinary action.  (*Id.*)  At this point, Plaintiff stopped
8    walking.   (*Id.* at 49.)  The TSU officers, in turn, "tried to make [Plaintiff] walk towards
9    the . . . softball field."  (*Id.*)  Plaintiff did not allow the TSU officers to make him keep
10   walking and instead "tried to sit down, like – in protest."  (*Id.*)  Critically, Plaintiff admitted
11   during his deposition that, at this point in the encounter, he would "consider that *struggling*
12   *with those officers*."  (*Id.*, emphasis added.)  The TSU officers responded by "slamm[ing]"
13   Plaintiff to the ground in an "aggressive manner."  (*Id.*)[1]  Plaintiff contends that, after he
14   went to the ground, one of the TSU officers had control of his left arm and the other had
15   control of his right arm.  (*Id.*)  Plaintiff further contends that the two officers never lost
16   control of him.  (*Id.* at 58.)  And Plaintiff contends that he was not struggling after being
17   put on the ground, nor was he fighting, cursing, or kicking at the officers.  (*Id.* at 57.)[2]

18        As noted, Williams (20 yards), Valdez (40-50 yards), and Theobald (150-200 yards)
19   were all located at least 20 yards away from where Plaintiff began struggling with the TSU
20   officers.  When Williams observed the struggle, he walked toward it and then released his
21   dog.  (Doc. 45-1 at 15-16.)  Williams was about "half a foot away" from Plaintiff at the
22   time of release.  (*Id.*)  Williams testified, without contradiction, that he didn't know

23   _____

24   [1]    Defendants largely dispute Plaintiff's version of these events.  In his declaration,
       Valdez avers that, when the two TSU officers were escorting Plaintiff outside, Plaintiff
25   began to struggle with them, including "thrashing and attempting to kick and headbutt the
       officers."  (Doc. 45-1 at 3 ¶¶ 12-13.)  Similarly, Williams testified during his deposition
26   that when he was about 20 yards away, he observed Plaintiff "being aggressive" with the
       officers by "trying to strike back by kicking them and headbutting them."  (*Id.* at 9.)

27   [2]    Defendants dispute that Plaintiff was not struggling while he was on the ground.
       Williams testified that Plaintiff was "actively fighting" with the officers while he was on
28   the ground and he could hear the TSU officers telling Plaintiff to "quit resisting and quit
       fighting."  (Doc. 45-1 at 10.)

1    Plaintiff was restrained at the time he made this decision.  (Docs. 45, 49 ¶ 27; Doc. 45-1 at

2    10.)  Williams testified that the entire sequence, from when he observed Plaintiff standing

3    by the TSU officers to when Plaintiff was taken to the ground by those officers to when he

4    released the dog, took only "20, 30 seconds."  (Doc. 45-1 at 10.)

5         Williams didn't give any verbal directions or commands to Plaintiff before releasing

6    the dog.  (*Id.*)  The dog attempted to bite Plaintiff, puncturing his skin, but the rest of the

7    bite only got ahold of Plaintiff's jacket.  (Docs. 45, 49 ¶ 31.)  At that point, Williams noticed

8    that Plaintiff's hands were restrained and almost immediately removed the dog from

9    Plaintiff.  (*Id.* ¶ 33; Doc. 45-1 at 12.)  The dog was never off-leash.  (*Id.*)

10        Theobald did not see Williams deploy the dog but heard someone yell, "dog, dog,

11   dog."  (Docs. 45, 49 ¶ 42; Doc. 45-1 at 28.)  "Theobald's only involvement was escorting

12   [Plaintiff] to medical after the incident."  (Docs. 45, 49 ¶ 43.)  Theobald testified that he

13   saw a "mark," like a "long scratch," on Plaintiff that did not "look like a typical dog bite."

14   (Doc. 45-1 at 29-30.)  Theobald testified that there was no puncture mark or tearing of the

15   flesh and that he did not see any "active" bleeding.  (*Id.*)  Theobald further testified that

16   Plaintiff had an abrasion or scratch on his back, which he would not classify as a "tear or

17   puncture."  (*Id.*)

18        A nurse noted that Plaintiff had sustained an avulsion wound on his back that was

19   eight centimeters long and .5 centimeters wide, which was seeping a scant amount of blood.

20   (*Id.* at 77.)  The provider also noted, "the wound was cleaned with N.S. copiously, and pat

21   dri[e]d, applied bacitracin ointment and then a Telfa patch covered by two tegaderms side

22   by side."  (*Id.* at 78.)  Plaintiff received a tetanus shot.  (*Id.* at 82.)  Another provider noted,

23   "Mid back has broken skin in a horizontal line about 8 inches across his back with no active

24   bleeding noted.  I/M able to move and ambulate appropriately with no issues moving

25   anything noted."  (*Id.* at 85.)

26        Plaintiff had the wound dressing changed the next day with no significant concerns

27   noted.  (*Id.* at 70.)  Two days later, the provider noted, "Old dressing removed with no

28

drainage noted.  Long superficial scratch on back which is aprox. 4 inches long."  (*Id.* at 67.)

II.    Procedural History

On January 9, 2019, Plaintiff, who is represented by counsel, initiated this action by filing a complaint.  (Doc. 1.)

On February 19, 2019, Plaintiff filed an amended complaint.  (Doc. 7.)

On July 29, 2019, Plaintiff filed a second amended complaint ("SAC").  (Doc. 25.)

On June 12, 2020, Defendants moved for summary judgment.  (Doc. 44.)

On August 11, 2020, Plaintiff filed a response.  (Doc. 48.)

On August 26, 2020, Defendants filed a reply.  (Doc. 50.)

On February 18, 2021, the Court issued a tentative ruling.  (Doc. 52.)

On March 2, 2021, the Court heard oral argument.  (Doc. 53.)

**DISCUSSION**

I.    Summary Judgment Standard

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "[T]o carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  "If . . . [the] moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Id*. at 1103.

"Summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)).  "A genuine

dispute of material fact exists if 'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'"   *United States v. JP Morgan Chase Bank Account No. Ending 8215 in Name of Ladislao V. Samaniego, VL: $ 446,377.36*, 835 F.3d 1159, 1162 (9th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)).   The court "must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inference in the nonmoving party's favor." *Rookaird*, 908 F.3d at 459.   Summary judgment is also appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."   *Celotex*, 477 U.S. at 322.

II.     Williams—Excessive Force

Plaintiff argues that Williams violated his Eighth Amendment right to be free from excessive force because "the release of [Williams's] canine and the biting of Plaintiff was an unnecessary and wanton infliction of pain.   Plaintiff was not struggling or fighting with the officers prior to the time when the canine was released to bite him.   At all times, when Plaintiff was standing up, and when he was taken to the ground, he was under the control of two TSU officers. . . .   Williams did not issue any orders or commands to Plaintiff prior releasing his dog, despite a rule mandating this, and released the dogs within seconds of Plaintiff being forced to the ground." (Doc. 48 at 5-6.)   Williams seeks summary judgment on this claim on the grounds that (1) he didn't violate Plaintiff's Eighth Amendment rights, and alternatively (2) he is entitled to qualified immunity.   (Doc. 44 at 6-9.)   As explained below, the Court agrees that Williams is entitled to qualified immunity.

A.     **Excessive Force And Qualified Immunity**

When a prisoner asserts that a prison official violated his Eighth Amendment rights by using excessive physical force, the relevant inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."   *Hudson v. McMillian*, 503 U.S. 1, 7 (1992).   As the Supreme Court has emphasized, "not . . . every malevolent touch by a prison guard gives rise to a federal cause

of action." *Id.* at 9.  Thus, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Meredith v. State of Ariz.*, 523 F.2d 481, 483 (9th Cir. 1975) (citation omitted), *abrogated on other grounds as recognized in Sinaloa Lake Owners Ass'n v. City of Simi Valley*, 882 F.2d 1398, 1408 n.10 (9th Cir. 1989).

The Court considers the following factors when determining whether a defendant's use of force was malicious and sadistic for the purpose of causing harm: "(1) the extent of injury suffered by an inmate; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) any efforts made to temper the severity of a forceful response." *Furnace v. Sullivan*, 705 F.3d 1021, 1029 (9th Cir. 2013).  Prison officials "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Whitley v. Albers*, 475 U.S. 312, 321-22 (1986).

Meanwhile, "[q]ualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).  A government official's conduct violates "clearly established" law when "'the contours of a right are sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'"  *Id.* at 741 (citation and brackets omitted).  Although there need not be a "case directly on point," "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.*  In other words, the case law must "have been earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." *Shafer v. Cty. of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017).  *See also Hamby v. Hammond*, 821 F.3d 1085, 1095 (9th Cir. 2016) ("[T]he farther afield existing precedent lies from the case under review, the more likely it will be that the

1  officials' acts will fall within that vast zone of conduct that is perhaps regrettable but is at
2  least arguably constitutional.  So long as even that much can be said for the officials, they
3  are entitled to qualified immunity."); *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) ("This
4  Court has repeatedly told courts—and the Ninth Circuit in particular—not to define clearly
5  established law at a high level of generality.") (internal quotation marks omitted).

6       "Once the defense of qualified immunity is raised by the defendant, the plaintiff
7  bears the burden of showing that the rights allegedly violated were 'clearly established.'"
8  *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1157 (9th Cir. 2000).  *See also Romero v. Kitsap County*,
9  931 F.2d 624, 627 (9th Cir. 1991) ("The plaintiff bears the burden of proof that the right
10 allegedly violated was clearly established at the time of the alleged misconduct.") (citation
11 omitted).[3]  Although it "is often beneficial" to begin the analysis by addressing whether a
12 statutory or constitutional right has been violated, district courts are vested with discretion
13 to determine "which of the two prongs of the qualified immunity analysis should be
14 addressed first in light of the circumstances in the particular case at hand."  *Pearson v.*
15 *Callahan*, 555 U.S. 223, 236 (2009).

16      B.   **Analysis**

17      Plaintiff's theory is that because he wasn't struggling or fighting with the TSU
18 officers, Williams had no legitimate reason to deploy a dog against him (and, thus, the
19 decision to deploy the dog can only be attributed to a malicious and sadistic desire to cause
20 harm).  The problem with this theory is that it is not supported by the record.  Although the
21 parties may disagree about the *extent* to which Plaintiff was struggling with the TSU

22
23 [3]     Although *LSO* and *Romero* place the burden on the plaintiff, other Ninth Circuit
   opinions hold that "[q]ualified immunity is an affirmative defense that the government has
24 the burden of pleading and proving." *Frudden v. Pilling*, 877 F.3d 821, 831 (9th Cir. 2017).
   These opinions are difficult to reconcile.  *See generally Slater v. Deasey*, 943 F.3d 898,
25 909 (9th Cir. 2019) (Collins, J., dissenting from denial of rehearing en banc) ("The panel
   committed . . . error in suggesting that Defendants bear the burden of proof on the disputed
26 qualified-immunity issues presented in this appeal. . . .  [T]he applicable—and well-
   settled—rule [in the Ninth Circuit] is that '[t]he plaintiff bears the burden of proof that the
27 right allegedly violated was clearly established at the time of the alleged misconduct.'")
28 (citation and emphases omitted).

officers before Williams deployed the dog, Plaintiff cannot sidestep his own deposition testimony.  There, he admitted that he was engaged in some form of struggle with the TSU officers:

> Q.    So, the officers had indicated that they wanted to place you in the dirt, and you said you would rather be placed on disciplinary and put in isolation; is that accurate?
>
> A.    Yes.
>
> Q.    And what did they do next?
>
> A.    They proceeded to turn me and walk me towards the softball field.
>
> * * *
>
> Q.    And at this point were you struggling in any way?
>
> A.    I stopped walking.
>
> * * *
>
> Q.    And what happened next?
>
> A.    They continued to try to make me walk towards the baseball -- I mean, the softball field. And at this point, I kind of, like, went – I tried to sit down, like – in protest of going to the softball field.
>
> Q.    ***Would you consider that struggling with those officers***?
>
> A.    ***Yeah. Yes.***
>
> Q.    And what did the officers do in response?
>
> A.    Slammed me on the ground.

(Doc. 45-1 at 49, emphasis added.)

Thus, even construing the disputed facts in the light most favorable to Plaintiff, Williams was confronted with a situation in which (1) he observed, from about 20 yards away, Plaintiff "struggling" with a pair of officers, (2) he had "particular concern" about the security risks posed by the struggle because many other inmates were milling about, unrestrained, due to the contraband search that had just been conducted (Docs. 45. 49 ¶¶ 23-24); and (3) he was unaware that Plaintiff's hands were restrained.  Faced with these circumstances, Williams made a quick decision to deploy his dog—as noted, Williams testified without contradiction that the entire sequence, from when he observed Plaintiff standing by the TSU officers to when Plaintiff was taken to the ground by those officers to

when he released the dog, took only "20, 30 seconds." (Doc. 45-1 at 10.) And it is undisputed that as soon as Williams realized that Plaintiff's hands were restrained, he pulled back the dog and stopped the bite.

There is a colorable argument that the deployment of a dog under these circumstances does not amount to a violation of the Eighth Amendment. As noted, the Ninth Circuit follows a five-factor test for assessing claims of excessive force in the prison context. Here, the first factor (extent of injury) cuts in Williams's favor—although Plaintiff was bitten by the dog and suffered a bite wound, the evidence establishes that the wound wasn't severe and that Plaintiff didn't suffer any complications. Thus, Plaintiff suffered at most a minor injury. Likewise, the fifth factor (efforts made to temper severity) cuts strongly in Williams's favor because he removed the dog from Plaintiff almost immediately after the initial bite, thereby avoiding serious injury.

The second, third, and fourth factors (need for use of force, relationship between need and force used, and whether the defendant reasonably perceived a threat) present a closer question. Had Williams released the dog despite the absence of any struggle between Plaintiff and the TSU officials, these factors would cut in Plaintiff's favor. *See, e.g., Kesler v. King*, 29 F. Supp. 2d 356, 372 (S.D. Tex. 1998) ("Plaintiffs allege that Defendant Cisneros, the K-9 handler, allowed his dog to bite as many as five inmates without provocation. . . . These claims clearly allege violations of Plaintiffs' constitutional right to be free from excessive force in the prison setting."). *Cf. Mendoza v. Block*, 27 F.3d 1357, 1362 (9th Cir. 1994) ("[N]o particularized case law is necessary for a deputy to know that excessive force has been used when a deputy sics a canine on a handcuffed arrestee who has fully surrendered and is completely under control."). But those aren't the facts here. Because Plaintiff admits that he *did* struggle with the TSU officers to some degree, and because the situation unfolded so quickly and in such a chaotic, potentially dangerous environment, it is far from obvious that Williams's decision to use deploy the dog was unnecessary. *Cf. Eason v. Frye*, 972 F. Supp. 2d 935, 943-44 (S.D. Miss. 2013) (granting summary judgment to prison guard, where plaintiff alleged that the guard used excessive

1   force by releasing a dog to bite him, because the plaintiff had "caused a disturbance by
2   threatening an officer" and "refused to stop fighting when Officer Frye ordered him to
3   stop" and thus "caused an obvious threat to security" that entitled the guard to "appl[y] the
4   amount of force necessary to restore order on the tier").  Although Plaintiff's description
5   of his struggle with the TSU officers paints a picture of passive rather than active resistance,
6   the Ninth Circuit has recognized that, at least for Fourth Amendment purposes, "[e]ven
7   purely passive resistance can support the use of some force." *Lowry v. City of San Diego*,
8   858 F.3d 1248, 1259 (9th Cir. 2017) (en banc).  Furthermore, even if Williams
9   misperceived the threat posed by Plaintiff's struggle with the TSU officers, the Constitution
10  doesn't prohibit reasonable mistakes of fact. *Cf. Graham v. Connor*, 490 U.S. 386, 397
11  (1989) ("[T]he calculus of reasonableness must embody allowance for the fact that police
12  officers are often forced to make split-second judgments—in circumstances that are tense,
13  uncertain, and rapidly evolving—about the amount of force that is necessary in a particular
14  situation."); *Torres v. City of Madera*, 648 F.3d 1119, 1124 (9th Cir. 2011) ("Where an
15  officer's particular use of force is based on a mistake of fact, we ask whether a reasonable
16  officer would have or should have accurately perceived that fact.").  Thus, although the
17  second, third, and fourth factors do not cut decisively in Defendants' favor, they do not cut
18  decisively in Plaintiff's favor either.[4]

19       Had Williams only moved for summary judgment on whether he violated Plaintiff's
20  Eighth Amendment rights, the uncertainties discussed above may have counseled in favor
21  of allowing a jury to resolve that question. *Cf. Green v. City & Cty. of San Francisco*, 751
22  F.3d 1039, 1049 (9th Cir. 2014) ("Because this inquiry is inherently fact specific, the
23  determination of whether the force used to effect an arrest was reasonable under the Fourth

24  _____

25  [4]      In his response, Plaintiff argues that Williams's failure to provide a verbal warning
    before releasing the dog constituted a violation of the prison's administrative guidelines.
    (Doc. 48 at 3-4.)  But whether a prison official has "violated a state law or an internal
26  departmental policy is not the focus of our inquiry.  Rather, our focus is on whether a
    reasonable officer would have known that the [challenged] conduct violated [the
27  plaintiff's] federal statutory or constitutional rights rather than merely a state law or policy
    provision."  *Case v. Kitsap County Sheriff's Dep't*, 249 F.3d 921, 929 (9th Cir. 2001)
28  (citations omitted).  *See also Cousins v. Lockyer*, 568 F.3d 1063, 1070 (9th Cir. 2009)
    ("state departmental regulations do not establish a federal constitutional violation").

1  Amendment should only be taken from the jury in rare cases.") (citation omitted).  But

2  because Williams also moved for summary judgment on qualified-immunity grounds, the

3  Court has discretion to decide that issue before resolving the constitutional question.

4  *Pearson*, 555 U.S. at 236.

5      The Court will follow that approach here because Williams's entitlement to

6  qualified immunity is clear.  In his motion, Williams argues he is entitled to qualified

7  immunity because "there is no Ninth Circuit or Supreme Court precedent establishing that

8  using a canine to apply force to a prisoner constitutes excessive force."  (Doc. 44 at 9.)  In

9  his response brief, Plaintiff does not address, let alone refute, this argument.  Instead,

10  Plaintiff contends that "[t]he doctrine of qualified immunity does not protect an officer who

11  did not act reasonably in his or her actions."  (Doc. 48 at 11.)  But this is not the appropriate

12  way to overcome a defendant's invocation of qualified immunity—it is pitched at far too

13  high of a level of generality.  Although there need not be a "case directly on point,"

14  *Ashcroft*, 563 U.S. at 741, it was still Plaintiff's burden to identify settled law that would

15  have placed Williams on notice that the deployment of a dog under these circumstances

16  was unconstitutional.  *Tuuamalemalo v. Greene*, 946 F.3d 471, 477 (9th Cir. 2019) ("The

17  right must be settled law, meaning that it must be clearly established by controlling

18  authority or a robust consensus of cases of persuasive authority.").  Because Plaintiff did

19  not even attempt to do so[5]—and because the Court has not, through its own research,

20  _____

[5]  During oral argument, the Court gave Plaintiff a belated opportunity to identify
21  "your best case . . . that would have given fair notice to Williams that deploying a dog
under these circumstances violates the Eighth Amendment."  In response, Plaintiff
22  identified *Graham v. Connor*, 490 U.S. 386 (1989).  If anything, this response underscores
why Williams is entitled to qualified immunity.  In *Graham*, the plaintiff was a diabetic
23  suffering from an insulin reaction who briefly entered a convenience store in a search for
orange juice.  *Id.* at 388-89.  A police officer who witnessed the plaintiff's exit from the
24  store "became suspicious that something was amiss" and made an investigative stop.  *Id.*
After other officers arrived at the scene, they tightly handcuffed the plaintiff (who had
25  briefly passed out), shoved his face into a car, threw him headfirst into a police car, and
refused to allow him to drink orange juice.  *Id.*  Not only are those facts far different from
26  the facts of this case, but the legal issue in *Graham* (which the Court ultimately did not
resolve) was whether the officers' conduct violated the Fourth Amendment's prohibition
27  against excessive force.  *Id.* at 398-99.  The Court specifically noted that "[d]iffering
standards [apply] under the Fourth and Eighth Amendments" and characterized the "Eighth
28  Amendment standard" as the "less protective" of the two.  *Id.*  It is an understatement to
say that *Graham* did not arise from "such a concrete and factually defined context to make
it obvious to all reasonable government actors, in [Williams's] place, that what he is doing

1  uncovered a case authorizing liability under similar circumstances—Williams is entitled to

2  qualified immunity.

3  III.    Valdez And Theobald—Failure to Intervene

4          "[A] prison official can violate a prisoner's Eighth Amendment rights by failing to

5  intervene" when another officer acts unconstitutionally.  *Robins v. Meecham*, 60 F.3d 1436,

6  1442 (9th Cir. 1995).

7          Valdez argues he cannot be held liable under a failure-to-intervene theory because

8  he was located approximately 40-50 yards away from Plaintiff and was responsible for

9  supervising approximately 50 other prisoners who were congregated on the basketball

10 court.  (Doc. 44 at 5.)  Valdez further contends that he would not have been able to

11 intervene once Williams released the dog because he had been trained that only the dog's

12 handler can deploy or remove a dog.  (*Id.*)  In response, Plaintiff contends that Valdez

13 "stood by and watched all what happened and did nothing to prevent" Plaintiff "from being

14 attacked" by the dog.  (Doc. 48 at 9.)  Plaintiff asserts that "[i]t should have been obvious"

15 that he "presented no threat to them or himself once he was placed on the ground with his

16 hands zip tied behind his back."  (*Id.*)

17         Plaintiff's conclusory arguments lack merit.  It is undisputed that, at the time

18 Williams deployed the dog, Valdez was located 40 to 50 yards away and was responsible

19 for monitoring 50 other prisoners.  The incident occurred very quickly and Williams pulled

20 back the dog almost immediately after the first bite.  "[O]fficers can be held liable for

21 failing to intercede only if they had an opportunity to intercede."  *Cunningham v.

22 Gates,* 229 F.3d 1271, 1289 (9th Cir. 2000).  *See also Ting v. United States*, 927 F.2d 1504,

23 1512 (9th Cir. 1991) ("[T]he agents were positioned around the room away from Burns

24 and Ting and were thus physically incapable of preventing the incidents surrounding the

25 shooting, all of which transpired in a matter of seconds.  Therefore, it cannot be said that

26 the agents' failure to intervene was the cause in fact of Ting's injuries.").  Here, no

27 reasonable jury could find that Valdez had a reasonable opportunity to intercede.

28 _____

   violates federal law."  *Shafer,* 868 F.3d at 1117.

- 14 -

1    Plaintiff's failure-to-intervene claim against Theobald fails for similar reasons.  It is
2    undisputed that Theobald was 150-200 yards away from Plaintiff when the incident
3    occurred, that Theobald didn't even see Williams release the dog, and that Theobald's only
4    involvement was to escort Plaintiff to the medical unit after the incident.  (Docs. 45, 49 ¶¶
5    20, 41-43.)  On these facts, no reasonable jury could find that Theobald had a reasonable
6    opportunity to intercede.

7    IV.    All Defendants—Medical Care

8         To support a medical care claim under the Eighth Amendment, a prisoner must
9    demonstrate "deliberate indifference to serious medical needs."  *Jett v. Penner*, 439 F.3d
10   1091, 1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  There are
11   two prongs to the deliberate-indifference analysis: an objective standard and a subjective
12   standard.  First, a prisoner must show a "serious medical need."  *Jett*, 439 F.3d at 1096
13   (citations omitted).  A "'serious' medical need exists if the failure to treat a prisoner's
14   condition could result in further significant injury or the 'unnecessary and wanton infliction
15   of pain.'"  *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992), *overruled on other*
16   *grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997)).

17        Second, a prisoner must show that the defendant's response to that need was
18   deliberately indifferent.  *Jett*, 439 F.3d at 1096.  "Prison officials are deliberately
19   indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally
20   interfere with medical treatment."  *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002)
21   (internal citations and quotation marks omitted).  Deliberate indifference may also be
22   shown where prison officials fail to respond to a prisoner' s pain or possible medical need.
23   *Jett*, 439 F.3d at 1096.

24        Deliberate indifference is a higher standard than negligence or lack of ordinary due
25   care for the prisoner's safety.  *Farmer v. Brennan*, 511 U.S. 825, 835 (1994).  "Neither
26   negligence nor gross negligence will constitute deliberate indifference."  *Clement v. Cal.*
27   *Dep't of Corrs.*, 220 F. Supp. 2d 1098, 1105 (N.D. Cal. 2002).  *See also Broughton v.*
28   *Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980) (mere claims of "indifference,"

1   "negligence," or "medical malpractice" do not support a claim under § 1983).  A mere

2   delay in medical care, without more, is insufficient to state a claim against prison officials

3   for deliberate indifference.  *Shapley v. Nev. Bd. of State Prison Comm'rs*, 766 F.2d 404,

4   407 (9th Cir. 1985).  The indifference must be substantial.  The action must rise to a level

5   of "unnecessary and wanton infliction of pain."  *Estelle*, 429 U.S. at 105.

6          Even if deliberate indifference is shown, to support an Eighth Amendment claim,

7   the prisoner must demonstrate harm caused by the indifference.  *Jett*, 439 F.3d at 1096; *see*

8   *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989) (delay in providing medical

9   treatment does not constitute Eighth Amendment violation unless delay was harmful).

10         Plaintiff did not specifically assert an Eighth Amendment medical care claim in the

11  SAC.  (Doc. 25.)  Nevertheless, in his response to Defendants' motion, Plaintiff contends

12  he was denied prompt medical attention.  (Doc. 48 at 6.)  He asserts that when he told the

13  officers he needed medical attention because he had been bitten, one of the officers

14  responded, "they didn't bite you," which "completely ignore[d]" Plaintiff's request for

15  help.  (*Id.*)  In their reply, Defendants note that Plaintiff was escorted to the medical unit

16  within ten minutes of the incident and that Plaintiff returned for daily wound care over the

17  following week.  (Doc. 50 at 5.)

18         Even accepting as true that Plaintiff did not receive medical attention for his bite

19  wound for ten minutes, Plaintiff has not shown that he suffered any further injury as a result

20  of the delay.  Plaintiff suffered a superficial laceration that did not require stitches and he

21  experienced no complications, such as infection.  Thus, Defendants did not violate

22  Plaintiff's Eighth Amendment rights with respect to his medical treatment.

23         …

24         …

25         …

26         …

27         …

28         …

**IT IS ORDERED:**

     (1)    The reference to the Magistrate Judge is **withdrawn** as to Defendants' Motion for Summary Judgment (Doc. 44).

     (2)    Defendants' Motion for Summary Judgment (Doc. 44) is **granted**.

     (3)    The Clerk of Court shall enter judgment accordingly and terminate this action.

     Dated this 2nd day of March, 2021.

Dominic W. Lanza<br>
United States District Judge